**Wilfredo MARQUEZ–COLON, et al., Appellees,**

v.

**Ronald W. REAGAN, et al., Appellants.**

**Nos. 81–1041, 81–1334.**

United States Court of Appeals, First Circuit.

Argued Sept. 15, 1981.

Decided Dec. 23, 1981.

612

David Shilton, Atty., Dept. of Justice, Washington, D. C., with whom Anthony C. Liotta, Acting Asst. Atty. Gen., Peter R. Steenland, Jr., Dorothy Burakreis, and William Want, Attys., Dept. of Justice, Washington, D. C., were on brief, for appellants.

Michael J. Henke, Washington, D. C., with whom Richard G. Wilkins, Ann M. Ashton, Vinson & Elkins, Washington, D. C., Gerardo A. Carlo, Luis R. Davila Colon, and Nestor Ramirez, Dept. of Justice, Commonwealth of Puerto Rico, San Juan, P. R., were on brief, for the Commonwealth of Puerto Rico.

Fausto D. Godreau, with whom Enrique Colon, Rio Piedras, P. R., Norma Cotti, Pedro J. Saade Llorens, and Pedro J. Varela, Hato Rey, P. R., were on brief, for appellees Wilfredo Marquez-Colon, et al. and Jorge Colon, et al.

Marcos A. Ramirez Lavandero, Hato Rey, P. R., with whom Marcos A. Ramirez, was on brief for the municipality of Juana Diaz.

Before COFFIN, Chief Judge, VAN DUSEN, Senior Circuit Judge,* BOWNES, Circuit Judge.

COFFIN, Chief Judge.

This controversy arises out of the efforts of the federal government to provide adequate facilities for the more than 100,000 Cuban and Haitian refugees who have entered the country since April, 1980. Shortly after the government designated Fort Allen, Puerto Rico, as one of the holding centers where the refugees are to be processed for eventual resettlement, the Commonwealth of Puerto Rico, along with private citizens living near the Fort, brought suit in federal district court alleging that operation of the Fort as a holding center would violate a number of environmental laws. The nearby Municipality of Juana Diaz subsequently intervened as co-plaintiff.

On October 8, 1980, the district court issued a preliminary injunction barring the government from undertaking any construction or other preparation at Fort Allen pending the completion of an environmental impact statement (EIS) pursuant to the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(C). *Colon v. Carter*, 507 F.Supp. 1026 (D.P.R.1980). This court vacated the injunction on October 24, holding that § 501(c) of the newly-enacted

* Of the Third Circuit, sitting by designation.

Refugee Education Assistance Act of 1980 exempted federal action at Fort Allen on behalf of the Cuban and Haitian entrants from the EIS requirement of NEPA. We refused to consider a number of other issues not addressed by the district court. *Colon v. Carter,* 633 F.2d 964 (1st Cir. 1980).

After additional consideration, the district court on January 5, 1981, ordered a permanent injunction against the transfer of refugees to Fort Allen, finding that the construction at the Fort and its operation had violated or would violate § 102(2)(E) of NEPA, 42 U.S.C. § 4332(2)(E); various provisions of the Coastal Zone Management Act, 16 U.S.C. §§ 1451–1456, and regulations promulgated thereunder; § 106 of the National Historic Preservation Act, 16 U.S.C. § 470f, and its regulations; § 6001 of the Solid Waste Disposal Act, 42 U.S.C. § 6961; and the federal common law of nuisance. *Commonwealth of Puerto Rico v. Muskie,* 507 F.Supp. 1035 (D.P.R.1981). The federal government took the present appeal. On July 31, 1981, this court granted the government's motion to stay the injunction pending our determination of the merits, subject to a number of conditions, in order to accommodate the government's asserted urgent need to find space to house the refugees.

On September 15, 1981, the day oral argument was scheduled, the federal government announced that it had reached a con-sent agreement with the appellee Commonwealth of Puerto Rico, in which the government agreed to operate Fort Allen in compliance with a number of requirements. In view of this the Commonwealth agreed to withdraw from the case. The government stated during argument that the private appellees could join the agreement if they wanted; both the private appellees and the intervenor-appellee the Municipality of Juana Diaz were granted time to consider this possibility. The federal government subsequently—and in our view capriciously [1]—refused, however, to allow the Municipality to join the agreement; and the private appellees are unwilling to do so.

In light of this tangled procedural background, and aware of the serious interests at stake, we address the merits of this appeal. At the outset we underscore the fact that the issues before us all have to do with various technical provisions of laws directed toward preservation of the environment. The very poignant concerns which have been noted about the welfare of refugees fall beyond the confines of the inquiry permitted us.

The federal government's willingness to operate Fort Allen subject to the conditions of the consent agreement with the Commonwealth has a substantial effect on our disposition of this case. The consent agreement encompasses all the requirements included in this court's earlier stay order: in

---

1. Although we refrain from ordering the federal government, against its present will, to allow other parties to join its agreement with the Commonwealth, we memorialize its change of position to show why we consider its present posture to be unreasonable. Extracts from the oral argument follow:

Court: "One question that underlies all of the agreements—what's to prevent the federal government and Commonwealth from cancelling the agreement?...."

Attorney for U.S.: "... [T]echnically nothing.... I think the Commonwealth, if we were to vary from the terms of the agreement, would certainly have the right to enforce that agreement. Furthermore, if the private appellees were willing to join to this agreement and settle the case, I think we could do that, and that way, they would be a part of the agreement too."

\* \* \* \* \* \*

Attorney for Municipality of Juana Diaz: "I am not prepared at this time to discuss the effects of this consent agreement filed today.... We would like to ask the Court for a reasonable time to consider the possibility of joining the agreement...."

\* \* \* \* \* \*

Attorney for private appellees: ".... We ... need ... 15 days ... to see if there is a possibility to reach an agreement with the federal government. As a matter of fact, we have already talked in that regard."

\* \* \* \* \* \*

Court: "... [I]f an agreement is reached with both appellees, do you still want us to write an opinion...?"

Attorney for U.S.: "In that case, I think it would be entirely moot...."

The court thereupon allowed the private appellees and the Municipality time in which to decide whether or not to join the agreement.

particular, it states that the combined total of aliens housed at Fort Allen and permanent employees will not exceed 1500, with the number of aliens to be limited to approximately 800; that no solid waste will be disposed of in Juana Diaz, and that disposal elsewhere "shall be in accordance with Puerto Rico statutes and regulations"; and that the government will undertake thorough and adequate medical screening and other steps to prevent the outbreak of contagious disease. The government also agrees that Fort Allen will not be used as a detention center for longer than one year, beginning August 12, 1981, the date the first refugees arrived. Finally, in the consent agreement and papers subsequently filed with this court, the Commonwealth has accepted the government's archaeological report and literature search as substantial compliance with the National Historic Preservation Act, and has concurred in the government's consistency determination as required by the Coastal Zone Management Act.

The consent agreement renders moot several of the issues underlying the district court's injunction. The court specifically found that Fort Allen has sewage waste capacity for 1500 residents; its conclusion that operation of the Fort would necessarily violate the federal common law of nuisance and the substantive provisions of the Coastal Zone Management Act was based on the assumption that over 1500 people would be housed there, in which case "[t]he inevitable result . . . will be the release of partially treated sewage into the coastal zone." The court's finding that the Solid Waste Disposal Act would be violated was based on the premise that waste generated at Fort Allen "will be dumped into an already severely overloaded landfill [at Juana Diaz] that . . . has been known to permit solid waste to be carried downstream through the coastal zone." The federal

government's agreement to limit the number of Fort Allen residents to 1500 and to dispose of the waste generated at the Fort elsewhere than at Juana Diaz and in compliance with Puerto Rican law undermines the factual basis for the district court's legal conclusions. In addition, both the Commonwealth and the federal government agree that operation of the Fort will be consistent with Puerto Rico's coastal management plan. We therefore vacate as moot the court's rulings with respect to the Solid Waste Disposal Act, the substantive provisions of the Coastal Zone Management Act, and the federal common law of nuisance.[2]

With respect to the National Historic Preservation Act, the Commonwealth has accepted the government's report, updated by its literature search, as substantial compliance with the Act, and has indicated that it has no knowledge of any National Register sites that will be affected by the planned use of Fort Allen. Nor did the district court find that any National Register or eligible historical sites will be harmed by the use of the Fort as a refugee center. Although we agree with the district court that the federal government failed to make the required studies before undertaking construction at Fort Allen, 16 U.S.C. § 470f, injunctive relief cannot cure any harm that might have occurred as a result of the completed *construction*; and in the absence of evidence that the Fort's *operation* will threaten any historical sites, an injunction barring the use of the Fort because of past violations of the Act is inappropriate. Cf. *Romero-Barcelo v. Brown*, 643 F.2d 835, 862 (1st Cir. 1981). Similarly, in light of the Commonwealth's determination that use of Fort Allen will be consistent with its coastal plan, we will not enjoin operation of the Fort based on the federal government's alleged past failure to provide adequate notice of its intended actions under the Coastal Zone Management Act.

---

**2.** We note also, as the district court recognized, that the Supreme Court has recently held that the federal common law of nuisance for interstate and coastal water pollution has been entirely preempted by the Federal Water Pollution Control Act, 33 U.S.C. § 1311 *et seq. City*

of Milwaukee v. Illinois, 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981); see *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n,* 453 U.S. 1, 21–22, 101 S.Ct. 2615, 2627, 69 L.Ed.2d 435 (1981).

The restrictions on the operation of Fort Allen in the consent agreement also color our analysis of appellees' claim that the government has violated § 102(2)(E) of NEPA, 42 U.S.C. § 4332(2)(E). Section 501(c)(3) of the Refugee Education Assistance Act of 1980 (REAA), 8 U.S.C. § 1522 note, states that the furnishing of assistance for the processing, care, and placement in the United States of Cuban and Haitian entrants "shall not be considered a major Federal action significantly affecting the quality of the human environment within the meaning of" NEPA. In our earlier opinion we held that this clause exempted activities at Fort Allen from the EIS requirement of NEPA, § 102(2)(C), 42 U.S.C. § 4332(2)(C). Appellees now argue, and the district court held, that the exemption does *not* apply to § 102(2)(E) of the Act, which requires that "all agencies of the Federal Government shall . . . study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."[3] Unlike § 102(2)(C), § 102(2)(E) is not on its face restricted to "major Federal actions significantly affecting the quality of the human environment"; thus, according to appellees, Congress intended in the REAA to exempt Fort Allen only from the EIS requirement, and not from other provisions of NEPA like § 102(2)(E).

We have substantial doubts that Congress intended to exclude § 102(2)(E) from the NEPA exemption in the REAA. The legislative history, while skimpy, does emphasize that § 501(c) of the REAA was designed to "enable the Executive branch to meet administrative . . . and legal requirements in a manner consonant with the emergency nature of these Cuban and Haitian operations." 126 Cong.Rec. H10122 (Sept. 30, 1980). The Congressional purpose was obviously to bypass a rigorous study of environmental alternatives in order to allow fast and effective federal action on behalf of the refugees. Yet a study of alternatives under § 102(2)(E) would have to cover much of the same ground as an EIS. *See* Note, 64 Geo.L.J. 1153, 1162–65 (1976). In such circumstances, "it would be a contortion of the intent of Congress to exclude the [federal government] from the impact statements, the linchpin of which is the discussion of alternatives, only to require that it study, develop, and describe alternatives." *Id.* at 1168 n.81.

Moreover, while § 102(2)(E) may apply even when a proposal does not contemplate a "major Federal action significantly affecting the quality of the human environment", the provision "extends only to a proposal that has a certain magnitude . . . and is controversial." *Aertsen v. Landrieu,* 637 F.2d 12, 20 (1st Cir. 1980); *see Trinity Episcopal School Corp. v. Romney,* 523 F.2d 88, 93 (2d Cir. 1975); Note, *supra,* 64 Geo. L.J. at 1159–60. The proposal to use Fort Allen was nothing if not controversial; but it is less clear that the current proposal involves a significant "unresolved conflict[ ]" concerning alternative uses of available resources." NEPA § 102(2)(E). The parcel of land at Fort Allen and its surroundings constitutes the "resources", not the funds to be expended on behalf of the refugees; and the only apparent conflict about Fort Allen is whether and to what extent it should be used to house refugees. *See Aertsen v. Landrieu, supra,* 637 F.2d at 20–21 & n.11. Were the government still proposing to use Fort Allen to hold up to 5000 refugees, with inadequate sewage and solid waste facilities, for an indefinite period of time, we would agree with appellees that there would be a significant environmental conflict between using the Fort in such a way and a continuation of the status quo. Under the conditions of the consent agreement, the question is much closer.

Assuming *arguendo* that § 102(2)(E) did apply, the government was required to

---

**3.** Even if, as the government urges, the President is not an "agency" subject to the requirements of NEPA, it is clear that the President did not make the "proposal" to use Fort Allen. At most, the President made the *decision* to utilize Fort Allen. *See Colon v. Carter,* 633 F.2d 964 (1st Cir. 1980). The government does not argue that the Cuban-Haitian Task Force, which made the original proposal, is not an agency for the purpose of § 102(2)(E) of NEPA.

"study, develop, and describe appropriate alternatives" to the proposal to use Fort Allen as a refugee center. At a minimum, this provision mandates that the government carefully study the environmental effects of using the Fort for this purpose against the other alternative *use* of Fort Allen, leaving it as it was. *See Aertsen v. Landrieu, supra,* 637 F.2d at 20–21. Here, where the government's objective was the broad one of finding a suitable location to hold the refugees, a comparative study of alternative *sites* might also have been necessary. Contrary to our dictum in *Aertsen,* we can envision proposals in which the issue of site selection raises serious environmental questions which should be addressed under § 102(2)(E). We need not decide whether such a study was required in the present case, because the cursory analysis contained in the government's "Preliminary Environmental Assessment" clearly failed to satisfy even the lesser requirement that the government study and describe the environmental consequences of using Fort Allen as a refugee center.

■ Even assuming, however, that the government violated § 102(2)(E) by failing to consider alternatives adequately when the original proposal was made, we are unwilling to approve a broad injunction barring the use of Fort Allen as a refugee center. In assessing the need for an injunction based on noncompliance with NEPA, it is appropriate for this court to balance the equities. *See Essex County Preservation Ass'n v. Campbell,* 536 F.2d 956, 962–63 (1st Cir. 1976); *see generally* W. Rodgers, Environmental Law § 7.10 (1977). With respect to the construction at Fort Allen undertaken in preparation for its use, we note that the compound was built on asphalt and concrete runways remaining from the Fort's use as a fighter base, not in a pristine wilderness area. Since any hypothetical damage caused by the completed construction cannot be alleviated by injunctive relief, we decline to enjoin the use of Fort Allen on this basis in the absence of bad faith on the part of the federal government. *See Ogunquit Village Corp. v. Davis,* 553 F.2d 243 (1st Cir. 1977).

We also deem significant the government's agreement to operate Fort Allen under the strict conditions noted earlier, particularly the 1500 person limitation, the provisions for solid waste disposal, and the one year duration for use of Fort Allen. Under these conditions, we think the environmental impact of using Fort Allen as a refugee center will be relatively minor. Moreover, the government's need to use Fort Allen for this purpose, as evidenced by the President's determination by Executive Order dated October 1, 1981, that it is "in the paramount interest of the United States to exempt Fort Allen" from various environmental laws not here applicable, weighs heavily against a broad injunction. We seriously doubt that the government would abandon Fort Allen at this point, even after a thorough environmental study. Finally, although we are concerned about the allegations of human suffering and deprivation at Fort Allen, it is beyond our power to seek to redress this aspect of the controversy in the context of an environmental lawsuit.

We therefore vacate the district court's injunction against the transfer of refugees to Fort Allen. We do so, however, on the understanding that the federal government will comply with all the conditions contained in its consent agreement with the Commonwealth, and that all parties to this controversy will receive notice should the federal government and the Commonwealth seek to modify the agreement in any way.

*So ordered.*