WICKER PARK HISTORIC DISTRICT PRESERVATION FUND, Candida M. Cantu, John Randall Damron, Deidre K. Papp, Charles M. Taylor, and James M. Walsh, Plaintiffs,

v.

Samuel Riley PIERCE, Jr., in his official capacity as Secretary, United States Department of Housing and Urban Development, and the United States Department of Housing and Urban Development, Defendants,

Bickerdike Redevelopment Corporation, an Illinois not-for-profit corporation, and West Town Housing Partners, an Illinois limited partnership, Intervening defendants.

No. 81 C 4757.

United States District Court, N.D. Illinois, E.D.

Dec. 16, 1982.

Roger Pascal, Thomas P. Battistoni, Schiff, Hardin & Waite, Chicago, Ill., for plaintiffs.

Dan K. Webb, U.S. Atty., Gail C. Ginsberg, Asst. U.S. Atty., Chicago, Ill., Richard C. Stearns, Trial Atty., Dept. of Housing & Urban Development, for defendants.

Sara J. Gourley, Anthony R. Licata, Chicago, Ill., for intervening defendants.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Plaintiffs, Wicker Park Historic District Preservation Fund and several individual residents of the Wicker Park Historic District ("Historic District"),[1] have brought this action against the United States Department of Housing and Urban Development ("HUD") and its Secretary to challenge HUD's approval of a proposal for federally-subsidized rental housing, part of which will be constructed on vacant lots within the Historic District. The developers of the proposed project, Bickerdike Redevelopment Corporation and West Town Housing Partners (sometimes referred to as "Bickerdike"), have intervened as defendants. Plaintiffs charge in their complaint that HUD's processing and approval of the proposed project was in violation of its statutory duties under the National Historic Preservation Act, 16 U.S.C. § 470 et seq. ("NHPA"), and the National Environmental Policy Act, 42 U.S.C. § 4331 et seq. ("NEPA"). The complaint thus typifies the not uncommon opposition that HUD has encountered from neighborhood organizations in connection with the proposed construction of federally-subsidized housing within their communities.[2] It also illustrates the frequently inevitable conflict between the legitimate and laudable goals of differing federal policies embodied in legislation. See Wisconsin Heritages, Inc. v. Harris, 490 F.Supp. 1334, 1342 (E.D.Wis. 1980). In this case the conflict is between the preservation of historically and architecturally valued urban communities and the provision of affordable and decent housing to lower income people in a variety of geographic settings.[3]

The parties have filed cross-motions for summary judgment pursuant to Fed.R. Civ.P. 56. This court finds that there are no genuine issues of material fact and that, under the appropriate standard of review, HUD's approval of the proposed project may not be disturbed. Defendants' motion

1. The Wicker Park Historic District encompasses most of the area bounded by Wabansia, North, Wood, Division, and Claremont Streets in Chicago, Illinois. It was placed on the National Register of Historic Places on June 20, 1979.

2. Examples in this circuit of suits involving challenges by community groups to HUD approval of public or federally-subsidized housing in their neighborhoods include Alschuler v. HUD, 686 F.2d 472 (7th Cir.1982); South East Lake View Neighbors v. HUD, 685 F.2d 1027 (7th Cir.1981); Nucleus of Chicago Homeowners Ass'n v. Lynn, 524 F.2d 225 (7th Cir.1975); Edgewater Community Council, Inc. v. HUD, No. 80 C 5690 (N.D.Ill. January 29, 1982); Cole-

man v. HUD, No. 81 C 1284 (N.D.Ill. January 11, 1982).

3. The Gautreaux litigation, which began with Gautreaux v. CHA, 296 F.Supp. 907 (N.D.Ill. 1969), was a challenge to the practices of HUD and the Chicago Housing Authority in choosing public housing sites in exclusively black areas. The litigation after many years culminated in a court-approved consent decree which established requirements for the provision of federally-assisted housing in predominantly non-minority or redeveloping areas. See Gautreaux v. Landrieu, 523 F.Supp. 665 (N.D.Ill.1981). The housing development in question here is subject to the geographic limitations imposed by the Gautreaux consent decree (R. 38–39).

for summary judgment is therefore granted.

### FACTUAL BACKGROUND [4]

#### A. *HUD Review*

The project in question, known as the Bickerdike Redevelopment Project, originally provided for the construction of 140 rental units in low density ratios on sites scattered throughout the Near Northwest Side of Chicago (R. 1, 5). The portion of the project that plaintiffs challenge is known as "Cluster C" and involves the construction of 27 one-, two- and three-bedroom units on four vacant lots located within the Historic District (R. 272–79).[5] The developers originally sought financing from the Government National Mortgage Association ("GNMA") and rental subsidies under § 8 of the United States Housing Act, 42 U.S.C. § 1437f. When they were unable to obtain GNMA funding the developers reapplied to HUD for financing with tax-exempt bonds under § 811(b) of the National Housing Act, 12 U.S.C. § 1748h–3(b). HUD ultimately approved the project for FHA mortgage insurance, 12 U.S.C. § 1715*l* (d)(4), the issuance of tax-exempt bonds, and § 8 rental subsidies.

The developers began the funding process in March of 1980 by submitting their proposal for initial technical approval by HUD (R. 1–2).[6] Among other exhibits included in this application were a location map, site plan, main elevation and floor plans for the proposed project, and details regarding the design and structure of the housing (R. 3, 84–85). HUD conducted a preliminary evaluation and field inspection (R. 84–105). It ranked each of the proposed building clusters along certain criteria. Cluster C received an overall ranking of 3.8 out of a possible five points. On the criterion of "*Design Compatibility*—is the building design suited to the site, does it fit in the neighborhood?", Cluster C received an average ranking of 4 (R. 99).

As part of its preliminary evaluation HUD completed form ECO ⅔—Normal and Special Environmental Clearance (R. 127–130). On the question of compliance with standards concerning historic properties, the project received a rating of A– (R. 127). The HUD field officer and a State Historic Preservation officer ("SHPO") were listed as the "source/documentation" for this rating. On the question of availability of various utilities and other services, the project received a uniform "A" rating, based on documentation by the City of Chicago (R. 128).

HUD did not complete the section of the ECO ⅔ entitled "Impacts on the Environment (Special Clearance)." This section requires ratings on such questions as "impact on social fabric and community structures" and "impact on aesthetics and urban design" (R. 128). Under "Environmental Findings", HUD concluded that "No EIS [Environmental Impact Statement] required. Project is consistent with HUD environmental policies and requirements and is not a major federal action significantly affecting the quality of the environment" (R. 130). In addition, the project was reviewed by nine different divisions of HUD and given preliminary approval by each (R. 120). One of these divisions, the Architectural Branch, concluded that the proposed design concept of the project was desirable and the proposed living unit designs were suitable (R. 163).

Based on the foregoing review, the Bickerdike project received preliminary approval for § 8 subsidies on September 7, 1980 (R. 173–176), and the developers then proceeded to the next review stage, the conditional commitment process. The developers submitted their application for a conditional commitment on February 12, 1981 after re-

---

4. The facts are drawn from the administrative record developed by HUD. The record will be referred to as "R. ———."

5. The developer originally proposed construction of 38 three- and four-bedroom units (R. 8, 24).

6. From the record it appears that HUD engages in a three-step review of proposals for federally-assisted housing construction: (1) preliminary proposal review; (2) conditional commitment review, and (3) firm commitment review.

ceiving several deadline extensions from HUD (R. 184–189). This application contained, among other documents, exhibits evidencing permissive zoning, a location map, and schematic drawings of the project (R. 189).

During the conditional commitment phase HUD representatives attended a meeting with the developers, officials of the Illinois Department of Conservation ("IDOC") and members of various Wicker Park community groups to discuss the proposed construction of subsidized housing in the Historic District (R. 383). Internal HUD memoranda during this period also indicate HUD awareness that it was required to examine the effect of the proposed project on the Historic District in determining whether or not to fund the project (R. 384, 411).

The developer was required to, and did, submit details of the design proposal for Cluster C to the SHPO for evaluation of its compatibility with the Historic District (R. 385, 408, 410). HUD representatives, in turn, were in touch with various SHPO's and relied on their evaluations in conducting their historic effects review (R. 416, 464).

On June 18, 1981, the Old Wicker Park Committee, a community group, wrote to Bickerdike expressing its opposition to the Cluster C development. The letter, which was copied to HUD, IDOC and the National Trust for Historic Preservation, among others, objected to (1) the architectural design as "totally non-sympathetic with the rich architectural features of the overall Wicker Park area;" (2) the introduction of a large density of low income units "that would not inspire future private development"; (3) the site planning which failed to give adequate consideration to "views, landscaping . . . and services such as garbage and parking"; and (4) the general appearance and subsequent maintenance of the project (R. 406–407). The developer responded specifically to each of these concerns in a letter which it copied to HUD and the other entities noted above (R. 388–90).

On September 24, 1981, HUD submitted to the federal Advisory Council on Historic Preservation ("ACHP") a report concluding that the Bickerdike project would not have an adverse effect on the Historic District (R. 412–457). The report specified that the proposed structures were in scale with buildings in the Historic District and that the proposed building design was compatible with existing structures in six respects (R. 413–414). The report also noted three respects in which the project would benefit the Historic District: (1) the proposed sites were vacant lots which have a detrimental aesthetic effect; (2) the new construction would be an incentive to additional investment in the area; and (3) the project would provide a limited amount of low- and moderate-income housing where "gentrification" had reduced the supply of such housing (R. 414). HUD concluded its report with the recognition that the construction of housing even more compatible with the Historic District was theoretically possible but unlikely, given the cost limits on construction of § 8 housing (R. 414–15). HUD's finding of no adverse effect was expressly conditioned upon the SHPO's review and approval of the final plans (R. 412).

On October 13, 1981 ACHP concurred in HUD's report and finding of no adverse impact (R. 458). On October 26, 1981 HUD completed an amended ECO ⅔ (R. 464–68), in which it rated the proposed project "B" as to compliance with applicable standards for historic properties (R. 465). As to all other criteria, HUD gave the project the same ratings it had received on the original ECO ⅔.

On the amended ECO ⅔, HUD completed the special environmental clearance section, giving the project an "A" rating on the criteria of "impact on social fabric and community structure" and "impact on aesthetics and urban design." The amended ECO ⅔ contained two additional comments: first, that environmental clearance was "subject to compliance with the 'Determination of No Adverse Effect,' namely SHPO's review and approval of final plans and specifications for the project"; and second, that "this form has been completed pursuant to

advice of counsel to clearly demonstrate that special clearance procedures were followed for project ..." (R. 468). HUD issued a conditional commitment on the proposed project on October 26, 1981 (R. 269–71).

The developer then initiated the firm commitment review process (R. 272–73). During this phase of review the project architect submitted to IDOC a set of drawings and specifications for the proposed Cluster C development, which incorporated changes earlier suggested by the SHPO. Also submitted were samples of building materials to be used in construction (R. 472). The SHPO reviewing the project then informed HUD and the Advisory Council on Historic Preservation that, based on these final plans and specifications, IDOC had no objection to initiation of construction activities. He requested, however, an opportunity to review and approve paint color selections as they were chosen (R. 473).

On January 18, 1981 plaintiffs in this action wrote to Senator Charles Percy to voice their objections to the Cluster C development. Plaintiffs charged that HUD had ignored the required review process for federally-funded projects in designated historic districts. The letter further complained that IDOC and ACHP had approved the project without soliciting comments of plaintiffs or other members of the community. Finally, plaintiffs contended that the proposed project would encourage demolition, discourage rehabilitation and strain already inadequate city services (R. 345–46).

Percy forwarded the letter to HUD (R. 347). HUD responded that (1) the project involved no demolition; (2) the project architect had designed buildings compatible in style, scale and texture with the Historic District; (3) the architect redesigned certain features of the project in conjunction with the SHPO; (4) it believed the project would encourage reinvestment in and preservation of the Historic District; (5) both IDOC and ACHP had concluded that the project would have no adverse effect on the District; and (6) the SHPO did attend a meeting with community groups on March 30, 1981 to discuss the project (R. 348).

After completing the three-step review process, HUD gave final approval for funding of the Bickerdike Development Project.

### B. *The Litigation*

On August 19, 1981 plaintiffs filed a two-count complaint against HUD, seeking a declaration that it had violated statutory requirements for reviewing the proposed project and an injunction against HUD's participation in the project. On January 18, 1982 this court dismissed the case with leave to reinstate because HUD had not yet completed its review process nor had it made a final determination regarding federal funding of the project.

On September 20, 1982 plaintiffs filed an amended complaint challenging HUD's approval of the project, and moved for a temporary restraining order. That motion was denied on September 21, 1982, after discussion with the parties respecting the expectable course of development and, in that context, a briefing schedule on summary judgment motions was established.

### THE CROSS–MOTIONS FOR SUMMARY JUDGMENT

### A. *Standard of Review*

The parties agree that the standards governing this court's review of HUD's decision to approve mortgage insurance and rental subsidies for the Bickerdike Redevelopment Project are found in the Administrative Procedure Act ("APA"), 5 U.S.C. § 702 *et seq.* HUD's decision can be set aside only if it is found to be

    (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law;

    (B) contrary to constitutional right, power, privilege, or immunity;

    (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law. . . .

5 U.S.C. § 706(2).

■ As to the claims which plaintiffs make in this case, the APA requires the court to engage in a threefold inquiry: (1) Did HUD review and assess all factors it is legally required to consider in making a final determination; that is, did it comply with statutorily mandated procedures? *Stryker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 227, 100 S.Ct. 497, 499, 62 L.Ed.2d 433 (1979); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 417, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1970); *Alschuler v. Dept. of Housing and Urban Development*, 686 F.2d 472, 481 (7th Cir.1982); *Nat. Ctr. for Preservation Law v. Landrieu*, 496 F.Supp. 716, 724 (D.S.C.), *aff'd* 635 F.2d 324 (4th Cir.1980); (2) In reaching its decision, did HUD develop a factual record sufficiently specific to permit judicial review? *Ely v. Velde*, 451 F.2d 1130, 1138 (4th Cir. 1971); *Edgewater Community Council, Inc. v. Dept. of Housing and Urban Development*, No. 80 C 5690, p. 5 (N.D.Ill.1982); and (3) Was HUD's decision reasonably supported by the administrative record so developed? *Bowman Transp. v. Ark.-Best Freight System*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–442, 42 L.Ed.2d 447 (1974). Thus, although this court's "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. at 416, 91 S.Ct. at 824.[7]

**B. *HUD's Duties Under the National Historic Preservation Act and the National Environmental Policy Act***

The National Historic Preservation Act, 16 U.S.C. § 470 *et seq.*, which was enacted for the purpose of aiding in the preserva-

tion of "the historical and cultural foundations of the Nation," requires that federal agencies,

> prior to the approval of the expenditure of any Federal funds on [an] undertaking ... take into account the effect of the undertaking on any district, site, building, structure or object that is included in or eligible for inclusion in the National Register.

16 U.S.C. § 470f. Agencies are also required to "afford the Advisory Council on Historic Preservation ... a reasonable opportunity to comment with regard to such undertaking." *Id.*

In addition to this statutory directive, Executive Order 11593 requires agencies of the Executive Branch to "institute procedures to assure that Federal plans and programs contribute to the preservation and enhancement of non-federally owned sites, structures and objects of historical architectural or archeological significance." 36 Fed.Reg. 8921, 3 C.F.R. 559 (1971–75 Comp.) HUD was thus required to examine the effect of the proposed Cluster C development on the Historic District in deciding its eligibility for federal funds.

The regulations promulgated pursuant to NHPA require the appropriate HUD official to make a determination, in consultation with the SHPO, whether a proposed project will have an effect on the historical, architectural, archeological, or cultural characteristics of properties included in the National Register, 36 C.F.R. § 800.4(b). If the undertaking will have an effect, HUD, again in consultation with the SHPO, must determine whether the effect will be adverse under certain enumerated criteria. 36 C.F.R. § 800.4(b)(2). Criteria of adverse effect "include but are not limited to":

> (1) Destruction or alteration of all or part of a property;

---

**7.** In reviewing agency action this court is also limited in the nature of the material it may consider. The factual record already developed at the administrative level must serve as the basis for decision, "not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36

L.Ed.2d 106; *Aertsen v. Landrieu*, 637 F.2d 12, 17, n. 8 (1st Cir.1980). If the existing record is inadequate, the proper course is to remand for further development of the record at the administrative level. *Edgewater Community Council, Inc. v. HUD, supra*, at p. 6.

(2) Isolation from or alteration of the property's surrounding environment;

(3) Introduction of visual, audible, or atmospheric elements that are out of character with the property or alter its setting;

(4) Neglect of a property resulting in its deterioration or destruction;

(5) Transfer or sale of a property without adequate conditions or restrictions regarding preservation, maintenance, or use.

36 C.F.R. § 800.3(b).

If HUD makes a determination of no adverse effect it must submit documentation of its determination to ACHP for comment. 36 C.F.R. § 800.4(c). ACHP, in turn, must review the determination and documentation and either concur in the determination, request additional documentation within fifteen days, or object to the determination in thirty days. ACHP concurrence terminates the NHPA review process. 36 C.F.R. § 800.6(a).

The National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.,* which has as one of its goals the preservation of "important historic, cultural, and natural aspects of our national heritage", 42 U.S.C. § 4331(b)(4), also imposes duties on HUD. NEPA requires that federal agencies prepare an Environmental Impact Statement ("EIS") whenever they propose "major federal action significantly affecting the quality of the human environment", 42 U.S.C. § 4332(2)(c). Identification of which federal actions are "major" and therefore require preparation of an EIS, has been left to the determination of the federal agency involved. 40 C.F.R. § 1500.3(a). *See Nucleus of Chicago Homeowners' Ass'n v. Lynn,* 524 F.2d 225, 229 (7th Cir.1975), *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976).

HUD has promulgated regulations and guidelines for implementing NEPA. 24 C.F.R. Part 50. Those regulations establish a two-level process for examining the envi-

ronmental impact of proposed HUD action. Depending on certain threshold guidelines, HUD must prepare either an Environmental Assessment, or an EIS. For proposed projects not meeting the EIS threshold, an Environmental Assessment, which may consist of either a Normal or a Special Environmental Clearance, is required. 24 C.F.R. 50.21. A Normal Environmental Clearance ("NEC") "is essentially a consistency check with HUD environmental policies and standards and includes a brief evaluation of environmental impact." *Id.* A Special Environmental Clearance ("SEC") "requires an environmental evaluation of greater detail and depth." *Id.* With respect to proposed § 8 housing, a SEC is required if the project exceeds 200 units, 24 C.F.R. Part 50, App. A–1, or if the project will have an effect on historic properties. HUD Handbook 1390.1, 38 Fed.Reg. 19185 (July 18, 1973).

If the proposed § 8 project consists of 500 to 2500 units, an EIS is required. 24 C.F.R. Part 50, App. 1.[8] In addition, "if during the preparation of an Environmental Assessment, impacts are identified that may have a significant impact on the environment, an EIS shall be prepared." 24 C.F.R. § 50.21. An EIS "explores and objectively evaluates reasonable alternatives, including identification of appropriate mitigation measures for each alternative, and has a definite format and content...." *Id.*

The regulations also impose time limitations on the completion of an Environmental Assessment, 24 C.F.R. § 50.21. With respect to the project in question, the required assessment was to be completed prior to HUD's notification to the developer of "selection of preliminary proposals," 24 C.F.R. Part 50, App. A–1.

The regulations promulgated pursuant to NHPA and NEPA contemplate coordination of the review and evaluation procedures required by both statutes. As stated in 36 C.F.R. § 800.9, "Federal agencies should coordinate NEPA compliance with

---

**8.** The exact threshold for preparation of an EIS is a function of the population of the metropolitan area in which the project is proposed to be built. 24 C.F.R. § 50.31(b). In this case an EIS would have absolutely been required if the project consisted of 2500 units. *Id.*

the separate responsibilities of the National Historic Preservation Act and Executive Order 11593 to ensure that historic and cultural properties are given proper consideration in the preparation of environmental assessments and environmental impact statements." The historic impact review and environmental assessment are to be conducted simultaneously. 36 C.F.R. § 800.9(b), 24 C.F.R. § 50.21(j).

### C. Plaintiff's Claims

#### 1. Alleged Violations of the NHPA

■ In Count I of their complaint plaintiffs allege that HUD violated § 106 of the NHPA, 16 U.S.C. § 470f, and Executive Order 11593, in its processing and approval of the Bickerdike Redevelopment Project. Specifically, plaintiffs object that HUD (1) ignored certain "adverse effects" that it is required to consider (¶ 16); (2) failed to provide ACHP with "information necessary for adequate consideration of modifications or alterations to the proposed [project] that could avoid, mitigate, or minimize any adverse effects" (¶ 17); (3) did not consider other sites for the project or rehabilitation of existing housing as alternatives to the Bickerdike proposal (¶ 18); and (4) failed to "institute or utilize procedures" that would assure preservation and enhancement of the Historic District (¶ 15). More broadly, plaintiffs allege that HUD's approval of funding for construction on lots recently cleared of historic structures is part of a pattern of "continuing encroachment upon the Historic District" (¶ 12) and "create[s] incentives for the razing of historic structures" (¶ 13).

Plaintiffs' specific claims of failure to follow the regulations promulgated pursuant to the NHPA are not supported by the record. The administrative record, as detailed above, shows that, early in the application process, HUD obtained details of the architectural design and structure of the proposed housing, conducted field inspections of the project sites, and rated the proposed building design vis-a-vis the sur-rounding neighborhood. As required by the regulations, it informed IDOC of the proposed project and the SHPO conducted an independent review of the project, examining the design proposal and samples of construction materials submitted by the architect. The SHPO suggested several revisions which were incorporated in the building design.

After consultation with the SHPO and after conducting its own evaluation, HUD reported in writing to ACHP that the project would have no adverse effect on the Historic District. In its report HUD expressly considered the adverse effect criteria enumerated in 36 C.F.R. § 800.3(b). The report further specified the manner in which the project design was compatible with existing historic structures and listed benefits to the Historic District which would result from construction. ACHP did not notify HUD of any deficiencies in its report [9] and subsequently concurred in its finding of no adverse effect.

It is clear from the administrative record that HUD satisfied its statutorily mandated duties to consider effects, both positive and negative, of the proposed project on the Historic District. HUD also met its duties under the APA to develop a factual record capable of judicial review.

Based on a review of this record, this court cannot say that HUD's determination of no adverse effect and its decision to fund the project was arbitrary or capricious. The reasonableness of HUD's decision is shown in HUD's report to ACHP, where it recognized that while a building design identical to existing structures was aesthetically possible it was financially impracticable, given § 8 funding limitations. The report also shows that HUD considered the negative and positive consequences of the proposed construction and concluded that the latter outweighed the former. In addition, HUD received input from outside sources—residents of Wicker Park as well as community groups interested in its pres-

---

**9.** HUD in fact did supply ACHP with the necessary documentation for its finding of no ad-verse effect as required by 36 C.F.R. § 800.-13(a)(1)–(6) (R. 413–417).

ervation—as to the desirability of the proposed project. The reasonableness of its decision is further supported by the concurrence of two entities primarily responsible for historic preservation: IDOC and ACHP.

In *Aertsen v. Landrieu,* 488 F.Supp. 314 (D.Mass.), aff'd, 637 F.2d 12 (1st Cir.1980), the court upheld a HUD finding of no adverse effect and approval of funding for a housing project within and near an historic district on the basis of a factual record almost identical to this one. *Aertsen* involved both new construction impacting on the historic district and rehabilitation of existing historic structures. After reviewing design plans and drawings, the materials to be used in the construction and rehabilitation, and a photograph of the area in question, and after engaging in meetings to discuss the project and making certain design changes, HUD concluded that the project would have no adverse impact. On the basis of the same documentation ACHP concurred in this determination, with the condition that final design plans be submitted to the SHPO for approval. Given this factual record the district court concluded that HUD's determination was neither arbitrary nor capricious and that the challenge to HUD's finding was without merit. 488 F.Supp. at 318–19.[10]

Similarly, in *National Ctr. for Preservation Law v. Landrieu, supra,* the court approved a HUD decision to fund a convention center within the Charleston historic district on an administrative record showing consultation with the SHPO and members of the public, meetings with members of community organizations, written comments from residents and preservation groups, and consultation with the project developers and architects resulting in certain design modifications. 496 F.Supp. at 740–41.[11] *See also Carson v. Alvord,* 487 F.Supp. 1049 (N.D.Georgia 1980) (approval of funding after consultation with state and regional historic preservation clearinghouses and based on their finding of no effect on historic properties not arbitrary or capricious). Likewise, this court finds nothing arbitrary or capricious about HUD's determination. in this case.

■ As to plaintiffs' claim that HUD failed to submit to ACHP adequate information on possible modifications of the project, the court finds that the NHPA regulations impose no such duty on HUD in the absence of a finding of adverse effect. The general requirement that HUD provide "the information necessary for adequate consideration of modifications or alterations to the proposed undertaking that could avoid, mitigate, or minimize any adverse effects", 36 C.F.R. § 800.4, is limited to situations where HUD has found adverse effects. *Compare* 36 C.F.R. § 800.13(a) with § 800.13(b).[12]

The court also finds that neither NHPA nor the regulations impose upon HUD a duty to consider alternative sites for construction or completely different housing proposals such as rehabilitation. All requirements in the regulations that consideration be given to alternatives and modifica-

---

**10.** The original project proposal in *Aertsen* called for demolition of eight historic structures. *Aertsen v. Harris,* 467 F.Supp. 117 (D.Mass.1979). The court issued a preliminary injunction against the proposed demolition and ordered HUD to supplement its historic review because it had failed to consider the effect of demolition and the alternative of rehabilitating the existing historic structures. The proposal in question here does not call for any demolition.

**11.** HUD review in this case was not as formal as that conducted in *National Ctr. for Preservation Law,* which involved execution of a Memorandum of Agreement to deal with adverse effects of the project, 36 C.F.R. § 800.6(c), and preparation of an EIS. However, the project in that case, which included construction of a large hotel and parking garage, convention center and commercial establishments, and involved demolition of existing historic structures, was much more elaborate than the project here. Given the nature of the proposed development in this case, HUD's simplified and less formal version of the *National Ctr. for Preservation Law* review was adequate.

**12.** As noted above, modifications were made in the original architectural designs, and though the changes were not specifically mentioned to ACHP, the modified designs were submitted to it.

tions are made in the context of a finding that a given proposal will have an adverse impact on an historic site or district. These references to alternatives are thus more sensibly interpreted as applying only to changes in the *existing* proposal that could make it more compatible with its surrounding environment. If we were to adopt plaintiffs' argument that HUD must consider completely independent and different proposals for the use of federal funds, *i.e.*, construction outside the historic district or rehabilitation of existing housing within it, then any proposal for construction within an historic district would always have to be rejected since the alternatives would always create less of an impact on the district. This court does not believe the NHPA was intended to go so far.

The court also finds no merit to plaintiffs' claim that HUD violated Executive Order 11593 in failing to institute or utilize procedures for the enhancement and protection of historic properties. ACHP promulgated the regulations set forth in 36 C.F.R. § 800.1 *et seq.* to comply with Executive Order 11593. HUD itself did not draft its own regulations but, as shown by the administrative record in this case, chose to adopt and use the ACHP procedures. *See also Watch v. Harris,* 603 F.2d 310, 324 n. 31 (2d Cir.) *cert. denied,* 444 U.S. 995, 100 S.Ct. 530, 62 L.Ed.2d 426 (1979); *Save the Courthouse Committee v. Lynn,* 408 F.Supp. 1323, 1337–38 (S.D.N.Y.1975). HUD complied with these regulations with respect to the proposal in question. Plaintiffs do not challenge the adequacy of the regulations and this court concludes that HUD's compliance with them fulfilled its duties under Executive Order 11593.

Finally, plaintiffs' broad allegations that HUD approval of the Bickerdike Redevelopment Project violates NHPA in that it constitutes a continuing encroachment on the Historic District and creates incentives for the demolition of historic structures are also without merit. As to the first claim, plaintiffs appear to be arguing that no federally-funded new housing construction should be permitted within the Historic Dis-

trict given the federal government's past involvement in housing construction within Wicker Park. The NHPA does not impose such a blanket prohibition, especially where, as here, the proposed construction is to occur on vacant land and involves no demolition of existing buildings, and the prior construction to which plaintiffs object took place before Wicker Park was designated an historic district. The court is sympathetic to plaintiffs' objections to the existing subsidized housing, which, as stated in the Wicker Park National Registry of Historic Places Nomination Form "is a shining example of the insensitivity if not outright stupidity so often embodied in renewal efforts and consists of two tall public housing towers surrounded by a vast expanse of emptiness." (R. 428) However, past mistakes do not warrant a total prohibition on new construction and the administrative record in this case reveals significant concern for compatibility of the proposed development with existing structures. If anything, the record demonstrates that the federal government has, at least in this case, learned the error of its ways in the urban renewal field.

As to plaintiffs' second claim, the court fails to see a causal connection between federal funding of new construction on land made vacant by demolition of existing buildings years before federal involvement and the future demolition of historic structures in Wicker Park. HUD had no part in those demolitions; and its approval of funding for new construction on already vacant land does not mean that it would decline to fund rehabilitation efforts with respect to existing buildings. If plaintiffs' claim is that the existence of federally-subsidized housing for low- and middle-income families in Wicker Park will somehow discourage private rehabilitation efforts, the court rejects it. Such a claim comes perilously close to arguing that housing for the lower socio-economic strata should exist only where rehabilitation or "gentrification" by the upper socio-economic strata is unlikely. This court does not believe that such a result was the goal or purpose of NHPA. *Cf.*

*Nucleus of Chicago Homeowners Ass'n v. Lynn,* 524 F.2d at 231 (community residents' fears of prospective public housing tenants not an environmental impact that must be considered under NEPA). In any event, HUD did consider the effect of the proposed project on future investment and concluded that it would be positive (R. 414).

The court finds no violation of HUD's procedural duties under the NHPA and concludes that its approval of the Bickerdike Redevelopment Project was neither arbitrary nor capricious. Summary judgment must therefore be granted in favor of defendants on Count I of the complaint.

## 2. Alleged Violations of NEPA

In Count II of their complaint plaintiffs charge that HUD violated the requirements of NEPA in four respects: (1) HUD failed to prepare an EIS analyzing the environmental impact of, and alternatives to, the proposed project (¶¶ 15–17); (2) it did not consider the impact of the proposed project on already inadequate city services (¶ 19); and (3) HUD's approval of the project constitutes a "continuing encroachment upon the Historic District" (¶ 12) and "create[s] incentives for the razing of historic structures" (¶ 13). The latter claim is identical to one raised in the NHPA count of plaintiffs' complaint and lacks merit for the same reasons discussed *supra,* at pp. 1076–1077. With respect to the first two claims, plaintiffs' focus has shifted in their briefs from whether HUD was required to file an EIS to the adequacy of its environmental review under the special environmental clearance procedures. This court will deal with both claims.

■ As noted above, NEPA, 42 U.S.C. § 4332(2)(c), requires the filing of an EIS whenever "major federal action significantly affecting the quality of the human environment" is proposed. NEPA further specifies the required contents of an EIS, including "alternatives to the proposed action". 42 U.S.C. § 4332(c)(iii). · However, the question of what constitutes a "major federal action" triggering the EIS requirement is a question left largely to the deter-

mination of the federal agency involved, pursuant to its own regulations. *See* discussion *supra,* at p. 1073.

Plaintiffs here have not challenged the facial validity of HUD's regulations governing the level of environmental review to be conducted. Under the law of this circuit, "HUD's determination that an environmental impact statement need not be filed must stand unless it is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." *Nucleus of Chicago Homeowners Ass'n v. Lynn,* 524 F.2d at 229 (citing *First National Bank of Chicago v. Richardson,* 484 F.2d 1369, 1381 (7th Cir. 1973)). *And see Aertsen v. Landrieu,* 488 F.Supp. at 321, n. 4 (discussing application of "arbitrary and capricious" standard versus "reasonableness" standard to HUD decisions not to prepare an EIS). It is clear from the record in this case that HUD abided by its own guidelines in deciding the level of environmental review required for the proposed project, *i.e.,* special environmental clearance. *See* 24 C.F.R. Part 50, App. A–1; HUD Handbook 1390.1, 38 Fed. Reg. 19185 (July 18, 1973). Thus, the decision not to file an EIS may not be overturned.

■ Plaintiffs' claim that HUD failed to consider the impact of the proposed project on the adequacy of city services as a result of its failure to prepare an EIS is not supported by the record. HUD's original ECO ⅔ gave the project an "A" rating with respect to the water supply, sanitary sewer, storm sewer and solid waste disposal systems based on documentation from the City of Chicago. Other utilities also received an "A" based on documentation from Commonwealth Edison and Peoples Gas. On the criterion of availability of recreational areas, HUD rated the project "A" based upon a field officer's inspection. In addition, HUD performed a noise assessment (R. 134–139) and an air quality analysis (R. 144–147). HUD also obtained certificates of adequacy from all the relevant utility providers prior to final approval of the project (R. 500–07). The record is clear that even though it did not prepare an EIS,

HUD thoroughly considered those factors plaintiffs mention, as well as many additional ones.

We turn now to the alleged inadequacies in the environmental review that HUD did conduct. As in Count I of their complaint, plaintiffs focus on HUD's analysis of the project's impact on the historic qualities of the area, claiming that HUD failed to "(1) take into account the factors relevant to impact upon a historic district, (2) consider any reasonably feasible alternatives to the proposed construction, or (3) create a reviewable record of the reasons for its determination of no adverse impact." (Pl. Memorandum, pp. 20–21.)

As discussed above, the record reveals that HUD did consider those criteria established by the NHPA regulations for determining whether a proposed project will have an adverse impact on an historic district. HUD has adopted the same criteria in its regulations governing environmental clearance for proposals involving historic properties, 24 C.F.R. 50.21(j). Plaintiffs contend that HUD should have considered, but did not, such factors as community perceptions of the historic significance of the area, disruption of community character and cohesiveness, disincentives to private rehabilitation efforts, and incentives to further demolition of historic structures.

Plaintiffs, however, have ignored the content of HUD's historic preservation review, which this court views as part and parcel of the environmental clearance process. In its determination of no adverse effect, HUD noted that the project, which involved infill of vacant land, would prevent further deterioration of adjoining structures, and that the new construction would be an incentive to additional investment in the area. HUD therefore did consider the effect of the project on preservation of the Historic District. As for consideration of the community's perceptions, the record shows that HUD officials met with community residents and representatives and that numerous community groups communicated their views, both positive and negative, regarding the role and importance of the proposed project in Wicker Park (R. 392–407).[13] Plaintiffs' mere disagreement with HUD's conclusions as to preservation of the Historic District and community perceptions of the proposed project is insufficient to overturn its decision.

To the extent that plaintiffs mean physical integration of the proposed project into the existing historic setting when they refer to "community character and cohesiveness," this court finds that HUD, in conjunction with IDOC and ACHP, examined and considered the architectural design, structure, and construction materials for the proposed project vis-a-vis existing structures. If plaintiffs are instead referring to the effect of the project, once inhabited, on demographic qualities of the Historic District, such a factor is not cognizable and need not be considered under NEPA. *See Nucleus of Chicago Homeowners' Ass'n v. Lynn*, 524 F.2d at 231.[14]

■ Plaintiffs challenge HUD's good faith in conducting the environmental review, arguing that its failure to complete the SEC until after this lawsuit was initially filed calls into question the validity of the review.[15] In essence, plaintiffs are ar-

---

**13.** Plaintiffs note that many of the letters supportive of the proposed project came from community group representatives who are also on the board of directors of Bickerdike. This connection with Bickerdike, however, does not necessarily destroy the credibility of those who also obviously represent other community interests.

**14.** Plaintiffs' claim that HUD did not develop an adequate administrative record of its environmental review has no merit. HUD fully documented its review of historic preservation factors under NHPA, and its consideration of

other environmental effects was documented in attachments to its Environmental Assessment.

**15.** The court notes that, although plaintiffs do not argue this point, HUD's regulations establish "selection of preliminary proposals" as the deadline for completion of an environmental assessment. *See* p. 1073, *supra*. In this case HUD had not completed its environmental assessment before preliminary approval of the project. The court concludes, however, this procedural default alone is insufficient to overturn HUD's approval especially in light of a record showing thorough consideration of envi-

guing that the decision to approve the project was arbitrary and capricious in that the underlying review was simply an after-the-fact attempt to appease the procedural requirements of NEPA without giving real, substantive attention to the environmental and historic preservation issues involved.

In challenging HUD's good faith on the basis of its timing, plaintiffs ignore the fact that the environmental and historical reviews were well in progress long before their lawsuit was filed. HUD had completed many of its environmental studies by August of 1980. HUD and the project developers met with community residents to discuss the project in March of 1981. Contact with and review by the SHPO began in 1980 and continued through 1981. Plaintiffs did not file their complaint until August of 1981. The record does not support the contention that this lawsuit was the impetus for HUD's completion of the SEC, which is simply the culmination of a long review process.

Neither does the comment on the SEC that "this Form has been completed pursuant to advice of counsel to clearly demonstrate that special clearance procedures were followed for the project" support the conclusion that HUD acted in bad faith or was only paying lip service to its regulations. The facts of this case are unlike those in *Save the Courthouse Committee v. Lynn, supra,* where HUD did not conduct an environmental review until *after* it had given final approval for funding of an urban renewal project involving demolition of an historic structure and *after* the plaintiffs had filed suit. Here, environmental reviews were in process before the filing of plaintiffs' complaint, and the original suit was, in fact, dismissed as premature because HUD had not yet taken final action. The environmental review was completed long before final approval of the project. The court concludes that the record does not indicate a lack of good faith on the part of HUD which would support a finding that

its determination was arbitrary or capricious.

The final question presented by plaintiffs' complaint is whether, under NEPA, HUD was required to consider alternatives to the proposed project during the course of its environmental review, and if so, whether it did consider alternatives. Plaintiffs claim that NEPA imposes on HUD a duty to consider other sites outside the Historic District or rehabilitation of existing structures as alternatives to the proposed new construction on vacant land within the district, and that HUD failed to do so. Defendants on the other hand argue that NEPA at most requires consideration of alternative uses of the sites in question, not consideration of completely separate and independent housing proposals involving different sites. Alternatively, defendants contend that HUD performed the broader examination of alternatives.

There are two statutory sources for the imposition of a duty to consider alternatives to a proposed action. Section 102 of NEPA, 42 U.S.C. § 4332(2)(c)(iii), requires that, when an EIS is determined necessary, it include a discussion of alternatives to the proposed action. Since the filing of an EIS is a prerequisite to this duty, and since this court has concluded that HUD's decision not to prepare an EIS in this case may not be overturned, this statutory section imposed no duty on HUD.

Section 102 also requires that HUD study, develop and describe alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources. 42 U.S.C. § 4332(2)(E). HUD's own regulations require compliance with § 102(2)(E) whenever a special environmental clearance is prepared. 24 C.F.R. § 50.3. The Seventh Circuit has held that compliance with § 102(2)(E) is "obligatory whether or not an impact statement is filed."

ronmental factors. Moreover, preliminary acceptance of the proposal did not constitute final approval, and the project could have been altered to reflect the environmental assessment up to the point of final agency action. *See Mejia v. HUD,* 688 F.2d 529 at p. 535 (7th Cir.1982).

*Nucleus of Chicago Homeowners Ass'n v. Lynn,* 524 F.2d at 232. *See also Aertsen v. Landrieu,* 637 F.2d 12, 20 (1st Cir.1980). This court must thus determine the extent of the duty imposed by § 102(2)(E) and whether HUD fulfilled that duty with respect to this project.

In *Nucleus of Chicago Homeowners Ass'n v. Lynn, supra,* plaintiffs charged that HUD did not consider the feasibility of broad scale metropolitan planning and the provision of comprehensive social services as alternatives to the construction of low-income housing. The court took a somewhat narrow view of the scope of HUD's duties under § 102(2)(E), recognizing that the *Gautreaux* litigation required provision of low-income housing and limited the available construction sites. It concluded that the indications in the administrative record that HUD had recommended elimination of two sites for failure to meet environmental standards satisfied its § 102(2)(E) duties. 524 F.2d at 232.

In *Aertsen v. Landrieu,* 637 F.2d 12 (1st Cir.1980), the court gave a restricted definition to the terminology of § 102(2)(E). It stated that the duty to consider alternatives comes into play only when there are unresolved conflicts and that, in the context of federal funding to develop a parcel of land, the land itself, not the federal funds, constitutes the resource. The court found that an interpretation of the term "resources," to include federal funds,

> would go in quite a different direction from the declared purposes of the NEPA, inasmuch as its focus would be not on whether a project harmonizes with and avoids damage to the environment where it is proposed to locate it, but on whether there is a more suitable location or project on which the government could spend its money. The latter raises what are primarily non-environmental questions. We therefore conclude that § 102(2)(E) of NEPA does not impose upon HUD the duty of studying, developing and describing other uses it could have made of the funds. . . .

637 F.2d at 20 (footnotes omitted). It concluded that HUD had satisfied its § 102(2)(E) obligations in considering the alternative of leaving the land proposed for new construction vacant, saying that HUD had no duty to consider alternatives that were "purely 'hypothetical,' such as construction of high-cost housing, stores, schools, churches [or] parks." *Id.* at 21.

In *Marguez-Colon v. Reagan,* 668 F.2d 611 (1st Cir.1981), the First Circuit took a second look at the duties of federal agencies under § 102(2)(E). In that case the plaintiffs challenged the government's selection of a particular site as a holding center for Cuban and Haitian refugees for failure to file an EIS and to consider alternative sites. The court held that the government was exempt from NEPA's EIS requirements under the Refugee Education Assistance Act, 8 U.S.C. § 1522, and went on to consider its duties under § 102(2)(E). The court concluded that, assuming *arguendo* the applicability of § 102(2)(E), the government was required at a minimum to consider the alternative uses of the site for the proposed refugee camp. 668 F.2d at 615–16 (citing *Aertsen v. Landrieu, supra* ). However, the court went on to say, "Contrary to our dictum in *Aertsen,* we can envision proposals in which the issue of site selection raises *serious environmental questions* which should be addressed under § 102(2)(E)." 668 F.2d at 616 (emphasis supplied).

This court agrees with the *Aertsen* analysis and concludes that, as applied to this case, HUD has fulfilled its duties under § 102(2)(E). The resource in question here is the several plots of vacant land on which the developer proposed to construct housing. Any unresolved conflicts concerning alternative uses of this resource revolved around the option of leaving the land vacant or, more narrowly, the design of the proposed housing to be constructed there. HUD dealt with both of those conflicts and possible alternatives in its environmental review. In its determination of no adverse effect HUD noted that the existence of vacant lots in the Historic District had a detrimental aesthetic effect and could result in further deterioration of neighboring

buildings (R. 414). HUD, in conjunction with SHPO, also considered and required changes in the proposed project. The number of units was reduced from 38 to 27, the size of the units was altered, and there were various modifications in architectural design and building materials.

The alternatives which plaintiffs contend should have been considered—construction on alternative sites and rehabilitation of existing building located elsewhere—are not available as alternatives for the resources in question.[16] To construe § 102(2)(E) as requiring analysis of alternatives to the proposed development as opposed to consideration of alternative uses of a given resource would, in effect, impose upon federal agencies the duty to prepare an EIS in connection with every proposed federal action, regardless of its size or the significance of its impact on the environment. Those decisions which have so construed § 102(2)(E) have limited it to concededly major federal actions, *Trinity Episcopal School Corp. v. Romney,* 523 F.2d 88 (2d Cir.1975),[17] or ones that raise serious environmental questions. *Marquez-Colon v. Reagan, supra.* This court concludes that any broader reading would impermissibly eliminate the distinctions among types of federal actions and the type of environmental review required that are implicit in NEPA and explicit in the regulations promulgated pursuant to NEPA.

None of plaintiffs' NEPA claims are supported by the factual record in this case and defendants are therefore entitled to summary judgment on Count II.

## CONCLUSION

For all of the foregoing reasons, the court concludes that defendants are entitled to judgment as a matter of law. Plaintiffs' motion for summary judgment is therefore denied and defendants' cross-motions are granted.

---

**16.** Plaintiffs' reliance on *Save the Courthouse Comm'n v. Lynn,* 408 F.Supp. 1323 (S.D.N.Y. 1975) and *Aertsen v. Harris,* 467 F.Supp. 117 (D.Mass.1979) for the proposition that HUD must consider the alternative of rehabilitating existing housing as opposed to new construction is misplaced. Those cases, unlike this one, involved proposals to demolish an historic structure. Therefore, the rehabilitation alternative was available with respect ·to the resource in question.

**17.** *Trinity Episcopal School Corp.* eventually reached the Supreme Court as *Stryker's Bay Neighborhood Council v. Karlen,* 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980). In *Aertsen,* the court suggested that language in the *Stryker's Bay* decision indicates that HUD's only duty under NEPA is to consider the environmental consequences of its actions, thus *sub silentio* reversing the lower court's view that HUD must consider alternative uses of federal funds. 637 F.2d at 20, n. 11.