**ATLANTIC TERMINAL URBAN RENEWAL AREA COALITION, John Theodore Glick, Anne McClellan, Loraine Oliver, and Mildred Davis, Plaintiffs,**

v.

**NEW YORK CITY DEPARTMENT OF ENVIRONMENTAL PROTECTION; New York City Public Development Corporation; New York City Board of Estimate; Edward I. Koch; Harvey W. Schultz; New York City Planning Commission; Sylvia Deutsch; United States Environmental Protection Agency; Lee M. Thomas; United States Department of Housing and Urban Development; and Samuel R. Pierce, Jr., Defendants.**

**No. 87 Civ. 4242(MEL).**

United States District Court, S.D. New York.

Sept. 29, 1988.

Edward Copeland, Elizabeth St. Clair, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., New York City, for plaintiffs.

Peter L. Zimroth, Corp. Counsel of the City of N.Y., New York City, for Municipal Defendants; Terri Feinstein Sasanow, Jeffrey Schanback, John De Angeli, Asst. Corp. Counsels, of counsel.

Rudolph W. Giuliani, U.S. Atty. for the S.D.N.Y., New York City, Richard W. Mark, Mary Ellen Kris, Asst. U.S. Attys., S.D.N.Y., for federal defendants.

Gershon M. Ratner, Associate Gen. Counsel for Litigation, Jonathan Strong, Sr. Trial Atty., John A. Martin, Trial Atty., U.S. Dept. of Housing & Urban Development, of counsel.

LASKER, District Judge.

These two motions to dismiss arise in a suit addressing the effect on the quality of air in Brooklyn of the proposed Atlantic Terminal and Brooklyn Center Projects ("the Project"), which would consist of dwelling, commercial, and recreational facilities. The plaintiffs include the Atlantic Terminal Urban Renewal Area Coalition, whose purpose is to protect and enhance the environmental quality in downtown Brooklyn, and several individuals who live in or travel through the Project site vicinity (collectively "ATURA"). Plaintiffs contend that the development of the Project will cause new, as well as exacerbate existing, violations of air quality standards for carbon monoxide. The defendants include numerous New York City and federal officials and agencies responsible for enforcement and administration of the Clean Air Act and for review and approval of the Project.

The United States Department of Housing and Urban Development and its Secretary Samuel Pierce (collectively "HUD") move to dismiss claim four of the complaint,[1] which alleges that:

Defendants HUD and Secretary Pierce acted arbitrarily, capriciously, in abuse of discretion and not in accordance with § 7506(c) of the Clean Air Act by approving a UDAG Grant [Urban Development Acting Grant] for the Project in spite of

the City's nonconformance with New York State's carbon monoxide plan, in violation of 5 U.S.C. § 706.[2]

HUD contends that, because it has delegated its responsibility for review of the environmental impact of the Project to the applicants themselves pursuant to 42 U.S.C. § 5304(f) (1982), allegations against it fail to state a cause of action upon which relief can be granted.

The New York City Department of Environmental Protection and its Commissioner Harvey W. Schultz, the New York City Public Development Corporation, the New York City Board of Estimate, Mayor of New York City Edward I. Koch, the New York City Planning Commission and its Chair Sylvia Deutsch, and the New York City Board of Estimate (collectively the "municipal defendants") move to dismiss the fifth claim of plaintiffs' amended complaint. The fifth claim states:

The grant to the City of UDAG funding, and the City defendants' seeking receipt of UDAG funding for a Project which does not conform to an approved SIP constitutes an exercise of delegated authority from HUD in violation of § 176(c) of the Clean Air Act, 42 U.S.C. § 7506(c).... [and] constitutes an exercise of delegated authority from HUD which is arbitrary, capricious, an abuse of discretion and not in accordance with law, in violation of 5 U.S.C. § 706.[3]

According to the municipal defendants, because HUD has not yet taken final action on the project, the fifth claim does not present a controversy ripe for decision.

Because plaintiffs' fourth and fifth claims are virtually identical, differing only as to the party to whom responsibility is attributed, the two motions are considered together. Assuming on the motion to dismiss for lack of subject matter jurisdiction or failure to state a claim that the plaintiffs' allegation that the Project will cause or heighten existing carbon monoxide viola-

---

1. After this motion was made, plaintiffs amended the complaint; the fourth claim of the amended complaint is identical to that of the original complaint.

2. Complaint at ¶ 49.

3. Complaint at ¶¶ 51–52.

tion is true, *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), the questions posed by these motions are who, if anyone, is legally responsible for approving the Project in violation of the Clean Air Act and at what point does that liability attach. In this instance, HUD claims that it is no longer responsible and the municipal defendants maintain that they are not yet responsible for the Project and its potential impact on the environment. Given the ambiguity in the law as to the point at which one party relinquishes and the other assumes responsibility and the limited time before which the City expects final action on the grant application, both motions are denied without prejudice to renew, as appropriate, should the grant be awarded.

## BACKGROUND

The proposed Project, conceived as part of the revitalization of downtown Brooklyn, is a development spanning twenty-four acres, which is to include offices, a cinema, a recreational facility, a parking garage, a supermarket, and several hundred subsidized moderate income residential condominium units. HUD is expected to be a major source of funding for the Project, with an award of over ten million dollars in the form of an Urban Development Action Grant ("UDAG") from HUD anticipated.

Prior to approval of the grant and release of funds, the applicant must comply with the procedures specified in Environmental Review Procedures for the Community Development Block Grant, Rental Rehabilitation and Housing Development Grant Programs, 24 C.F.R. Part 58 (1988). Specifically, the regulations require that if an environmental impact statement ("EIS") is required, the applicant must prepare and publish a draft EIS ("DEIS"). After con-

ducting a hearing and receiving comments about the draft, a final EIS ("FEIS") is to be prepared and released. After completing the FEIS, the grant applicant is to prepare a Record of Decision ("ROD") containing the information prescribed in 40 C.F.R. § 1505.2 (1987) and summarizing the monitoring and enforcement measures called for in the FEIS. After the ROD is certified, as required by 24 C.F.R. § 58.65 (1988), the applicant is to prepare a Notice of Intent ("NOI") and a Request for Release of Funds ("RROF"), indicating its intention to seek grant funding, which are to include a certification that all National Environmental Policy Act ("NEPA") processes have been completed. 24 C.F.R. § 58.70–.71 (1988). The notice and request must be published prior to its submission to HUD. Before approving a release of funds, HUD must consider any objections submitted prior to approving a release of funds by "any person or agency." 24 C.F. R. § 58.73 (1988).

In November 1985, the City of New York initiated the UDAG process by submitting an application for funds to aid in the Project's construction.[4] In the application, the City consented to assume the status of HUD "for environmental review, decision making and action" pursuant to NEPA and other environmental statutes, including § 176(c) of the Clean Air Act, listed in 24 C.F.R. § 58.5 (1988). The City also consented to accept the jurisdiction of the federal courts for enforcement of the environmental statutes, in effect, standing in the shoes of HUD.

The DEIS was completed in April 1986 and the FEIS in August 1986. According to the FEIS, 13 locations—also known as "hot spots"—in the area surrounding the Project will violate carbon monoxide standards both in 1988 and 1991.[5] Moreover,

---

**4.** Plaintiffs' Memorandum of Law in Opposition to Municipal Defendants' Motion to Dismiss Claim 5 ("Plaintiffs' Memorandum"), Exhibit A. The application of the City, which is annexed to Plaintiffs' Memorandum, may properly be considered although not part of the pleadings because the motions arise under Fed.R.Civ.P. 12(b)(1) rather than 12(b)(6). *Exchange National Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1131 (2d Cir.1976) (holding that

court may consider factual statements in plaintiff's affidavits as well as in pleadings on motion to dismiss for lack of subject matter jurisdiction).

**5.** Complaint, Exhibit B (Atlantic Terminal and Brooklyn Center Projects Final Environmental Impact Statement, August, 1986) at II.G–14.

the FEIS, according to plaintiffs, states that even with the proposed mitigation measures the Project will violate the carbon monoxide standard at eleven of these spots.[6] Therefore, according to the plaintiffs, any authorization of the Project violates the provision of New York's State Implementation Plan ("SIP") that requires the City to assure that mitigating measures will be adopted to achieve compliance with and maintain the Clean Air Act's carbon monoxide standard.

In a letter of October 16, 1986, Barbara Pastalove, Chief of the Environmental Impacts Branch of the EPA, informed Michael P.M. Spies, Assistant Vice President of the New York City Public Development Corp., that:

> EPA does not find the final EIS to be fully responsive to our concerns regarding air quality.... [T]he traffic mitigation plans proposed for both projects do not provide for attainment of the carbon monoxide (CO) standards by December 31, 1987. Therefore, the mitigation plans do not meet Clean Air Act requirements and could not receive EPA approval if submitted as control measures for the CO hotspots identified by the EISs.

A copy of the letter was sent to, among others, Joan Dabelko of HUD.[7] On October 23, 1986 HUD confirmed by letter that the Project had received preliminary approval for a UDAG for $10,730,000.[8]

Although the Project received preliminary approval, the City has yet to complete the application process. However, in response to an inquiry of the court, the City represented that it planned to submit the ROD in late September or early October, with the NOI and RROF to follow within the periods prescribed in 24 C.F.R. Part 58; it hopes for release of Project funds by early next year.

## DISCUSSION

### A. Statutory Scheme

Claims four and five contend, respectively, that HUD's approval of and the City's request for UDAG funding for the Project violate 5 U.S.C. § 706(2)(A) (1982), which provides that the court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." The plaintiffs argue that the actions of both the federal and municipal defendants do not comply with § 176(c) of the Clean Air Act, 42 U.S.C. § 7506(c) (1982), which states:

> No department, agency, or instrumentality of the Federal Government shall (1) engage in, (2) support in any way or provide financial assistance for, (3) license or permit, or (4) approve, any activity which does not conform to a plan after it has been approved or promulgated under section 7410 of this title [specifying standards for adoption of state implementation plans for national primary and secondary ambient air quality standards].... The assurance of conformity to such a plan shall be an affirmative responsibility of the head of such department, agency, or instrumentality.

The claim is that the City by seeking and HUD by preliminarily approving the UDAG, despite the FEIS indications that the area surrounding the Project would not conform with the New York SIP, have violated § 176 of the Clean Air Act, and therefore also acted in violation of 5 U.S.C. § 706.

### B. HUD's Motion

█ HUD moves to dismiss plaintiffs' fourth claim, arguing that even if the grant applicant has violated the Act, plaintiffs have no valid claim for relief against HUD. HUD contends that, acting under 42 U.S.C. § 5304(f)(1), it has delegated its responsibility for environmental review to the grant applicant and thus "has no legal responsibility for whether the Applicant complies with the applicable environmental laws." Plaintiffs answer that HUD has an affirmative duty under § 176 of the Clean Air Act to ensure that New York City does not use

---

**6.** Complaint, Exhibit B at IV–32.

**7.** Complaint, Exhibit D.

**8.** Plaintiffs' Memorandum, Exhibit B.

HUD money in violation of the New York State SIP and that that duty, unlike the duties imposed by NEPA, is nondelegable. Although the duties specified in § 176 of the Clean Air Act are delegable, HUD's motion to dismiss is nevertheless denied on the grounds that the October 16, 1986 letter of the EPA put HUD on notice that the environmental review record in this case does not presently comply with HUD regulations and, in addition, there is a serious question whether HUD has satisfied its responsibilities under NEPA until it approves the grant applicant's certification, which accompanies the RORF.

Section 104(f) of Title I, Housing and Community Development Act of 1974 ("HCDA"), 42 U.S.C. § 5304(f)(1) (1982), states:

> In order to assure that the policies of the National Environmental Policy Act of 1969 [42 U.S.C.A. § 4321 et seq.] and other provisions of law which further the purposes of such Act (as specified in regulations issued by the Secretary) are most effectively implemented in connection with the expenditure of funds under this chapter, and to assure to the public undiminished protection of the environment, the Secretary, in lieu of the environmental protection procedures otherwise applicable, may under regulations provide for the release of funds for particular projects to recipients of assistance under this chapter who assume all of the responsibilities for environmental review, decisionmaking, and action pursuant to such Act, and such other provisions of law as the regulations of the Secretary specify, that would apply to the Secretary were he to undertake such projects as Federal projects.

Subsection (f)(3)(D) of § 5304 also specifies that the grant applicant shall, in the certification accompanying the request for release of funds, "consent[ ] to assume the status of a responsible Federal official under [NEPA] and each provision of law specified in regulations issued by the Secretary ..." and consent "to accept the jurisdiction of the Federal courts for the purpose of enforcement of his responsibilities...."

■ Although HUD's authority to delegate under § 104(f) has consistently been upheld despite challenges that such delegation frustrates Congressional intent in passing environmental statutes, *Crosby v. Young*, 512 F.Supp. 1363, 1381–82 (E.D. Mich.1981) (reviewing previous challenges to the delegation and holding "the delegation of environmental responsibilities is a matter that Congress considered carefully and provided for with appropriate safeguards...."), no court appears to have considered whether the affirmative responsibilities of federal agencies articulated in § 176(c) of the Clean Air Act can be delegated. However, based on the legislative history of § 5304, regulations subsequently adopted, and the reasoning of case law upholding HUD's delegation of other environmental responsibilities, it appears that the duties of § 176(c) are delegable.

In 1979, § 5304(f)(1), which was then designated as § 5304(h) [9], was amended to refer not only to NEPA, but also to "such other provisions of law as the regulations of the Secretary specify." Pub.L. No. 96–153, § 103(g)(2), 93 Stat. 1102, 1105 (1979). Speaking of the delegation of environmental review authority, the Joint Explanatory Statement of the Committee of Conference asserted:

> The conferees are aware that there has been some confusion over whether the Secretary has the authority to delegate such authority with regard to Acts other than the National Environmental Policy Act of 1969 (NEPA). Specifically, the conferees wish to make clear that delegations can also be made with regard to the National Historic Preservation Act of 1966, Coastal Zone Management Act of 1972, Wild and Scenic Rivers Act, Flood Disaster Protection Act and Clean Air Act, as well as other Acts which further the purposes of the NEPA.

---

**9.** Section 5304(h) was redesignated as § 5304(f), with the adoption of Pub.L. No. 97–35, 95 Stat.

384, 386 (1981).

H.R.Conf.Rep. No. 96–706, 96th Cong., 1st Sess. 44–45 (1979), *reprinted in* 1979 U.S. Code Cong. & Admin.News 2317, 2402, 2403–04. Moreover, 24 C.F.R. § 58.5 (1988), part of the regulations implementing § 104 of the Housing and Community Development Act of 1974, states:

> Under section 104(f), a grant recipient's assumption of the responsibility for environmental review, decision-making and action includes those responsibilities below.
>
> . . . .
>
> (g) *Air quality.* The Clean Air Act (42 U.S.C. 7401 *et seq.*) as amended; particularly section 176(c) and (d) (42 U.S.C. 7506(c) and (d)).

Thus, both the 1979 Congressional Conference Report and the regulations adopted in 1982 reflect a clear intent to enable HUD to delegate responsibilities arising under the Clean Air Act. *See National Center for Preservation Law v. Landrieu,* 496 F.Supp. 716, 738–40 (D.S.C.) (upholding HUD's delegation of National Historic Preservation Act responsibilities based on the 1979 amendment to § 104 of HCDA and the explanatory conference report), *aff'd,* 635 F.2d 324 (4th Cir.1980).

Plaintiffs' argument that § 176(c) of the Clean Air Act imposes upon HUD nondelegable duties because it requires an affirmative duty does not differ significantly from arguments that have consistently been rejected challenging HUD's delegation of other statutory responsibilities. For example, most recently in *Brandon v. Pierce,* 725 F.2d 555, 559 (10th Cir.1984), the plaintiffs challenged the validity of HUD's environmental regulations, contending that their failure to require HUD to conduct an independent review of a UDAG applicant's

environmental review record constituted an unlawful delegation of the duty imposed upon Federal agencies by § 4332 of NEPA to "perform environmental review responsibilities under NEPA 'to the fullest extent possible.'" The court rejected the argument, satisfied with Congress' intent as expressed in what is now 42 U.S.C. § 5304(f) that NEPA responsibilities were to be transferred to the local grant applicant.[10] *See also Crosby v. Young,* 512 F.Supp. 1363, 1380–82 (E.D.Mich.1981) (reviewing challenges to HUD's delegation of NEPA responsibilities, including the argument that the delegation would undermine environmental statutes, and upholding the delegation based on Congress' intent as expressed in 42 U.S.C. § 5304(h) (now § 5304(f))).

■ However, HUD's authority to delegate its responsibilities is not without limitation, either as to the nature of the duties that may be delegated or the point at which the grant applicant fully assumes the responsibilities. Plaintiffs argue persuasively that HUD's preliminary approval of the grant application, after having received notice of the Project's failure to comply with the Clean Air Act, raises a sufficient question as to HUD compliance with its duties to require that it remain a party to this suit.[11] Two cases guide and support this conclusion.

In *Colony Federal Savings & Loan Ass'n v. Harris,* 482 F.Supp. 296 (W.D.Pa. 1980), the plaintiff charged HUD with abuse of discretion for failure to evaluate critically the applicant's environmental review prior to approving the UDAG, to monitor in an ongoing fashion compliance with HUD requirements, and to provide an adequate opportunity for public participation

**10.** The court also noted that in its 1979 amendments "Congress reaffirmed and broadened HUD's delegation authority," by ensuring that it extended to environmental responsibilities in addition to NEPA including those of the Clean Air Act. *Id.* at 560 n. 2.

**11.** After this decision was drafted, the court in *South Portland Avenue Block Association v. Pierce,* No. 87–4210 (E.D.N.Y. September 23, 1988) [available on WESTLAW, 1988 WL1011-306], a case also challenging the Atlantic Termi-

nal Project, granted HUD's motion to dismiss a claim alleging that HUD had violated NEPA by failing to consider the environmental impact of the Project and seeking to prevent disbursement of the UDAG. In that case, unlike the case at hand, there is no indication that the plaintiffs alleged that HUD had received notice from the EPA of the Project's failure to comply with the Clean Air Act; that letter, as described below, distinguishes this case and its result from *South Portland.*

in the project. The court rejected the first argument, stating that "neither the Secretary nor HUD has an independent duty to evaluate the conclusions of an environmental review record where such a record is facially complete and in accord with HUD regulations." *Id.* at 303. The court held it "need not reach the question of the actual sufficiency of the 24 C.F.R. § 5817(b) notice [requiring that the notice of intent be sent to interested parties] on the motion to dismiss." Instead, the court reasoned:

> It may be that failure to provide proof of notice of the project to these landowners ... rendered the application ... facially incomplete and in violation of the applicable regulations so that the federal agency's responsibility under the APA ... was triggered. However, ... even if the grant application appeared complete and in compliance with all the applicable regulations, the federal agency has since been put on notice ... that an important procedural step may have been omitted.... [T]he failure of the federal defendants to review the sufficiency of notice to interested parties and to require notice, once such a serious omission was alleged, requires that the federal defendants remain parties to this suit....

*Id.* at 304 (citation omitted). Thus, HUD could not prevail on its motion to dismiss, even if the application appeared facially complete; the notice alerted HUD to a deficiency, which HUD arguably had no duty to otherwise find.

The court in *Raleigh Heights Homeowners Protective Association v. City of Reno*, 501 F.Supp. 269 (D.Nev.1980), *aff'd without opinion*, 692 F.2d 765 (9th Cir. 1982), similarly held that HUD had a duty to ensure that funds were used in a manner conforming with NEPA once put on notice of an irregularity in the process. In *Raleigh*, the plaintiffs moved to enjoin further release of HCDA funds because the actual site of the project had changed from that on which the environmental review was based. The motion was denied, because the citizens would have an opportunity to voice their concerns after completion and publication of a new environmental review. However, the court cautioned that "[o]nce

put on notice that the funds released were to be used for a purpose other than for which they had been approved, the federal authorities had an affirmative obligation to insure that the new use of the money was proper and complied with Federal regulations." *Id.* at 273.

In the case at hand, HUD has been put on notice by the EPA that the Project may not comply with federal regulations. The EPA, like the plaintiff in *Colony Federal*, has alerted HUD "that a serious procedural omission may have occurred," namely that the grant recipient cannot certify, based on the FEIS, that it has complied with all obligations and responsibilities of the Clean Air Act that would apply to HUD, as required by 24 C.F.R. § 58.5 (1988). Therefore, even assuming that the FEIS and the application submitted thus far are facially complete, HUD cannot, as the federal defendants could not in *Colony Federal*, prevail on its motion to dismiss. The EPA letter has triggered HUD responsibilities under the APA, 5 U.S.C. § 706, to monitor compliance of the Project with the Clean Air Act.

■ Moreover, although the parties do not address the issue, there is a serious question whether HUD can relinquish responsibility for compliance with the environmental statutes until the City certifies, in relevant part, that it has complied with the environmental review responsibilities specified in 42 U.S.C. § 5304(f)(1) (1982). Although the City has consented to assume the status of HUD for environmental review, it has not yet certified within the meaning of the regulations that it has complied with the applicable environmental statutes and thus relieved HUD of its responsibilities. Moreover, the City cannot so certify at this point. The regulations provide that the certification is to accompany the RROF. 24 C.F.R. § 58.70 (1988). Until the certification is submitted and approved, the Secretary, according to the statute, cannot delegate the environmental responsibilities. Section 5304(f)(2) (1982) states in relevant part:

> The Secretary's approval of any such certification shall be deemed to satisfy his

responsibilities under [NEPA] and such other provisions of law as the regulations of the Secretary specify insofar as those responsibilities relate to the releases of funds for projects to be carried out pursuant thereto which are covered by such certification.

Additionally, 24 C.F.R. § 58.77 (1988) (emphasis added), which is entitled "Effect of approval of certification," provides that "[p]ersons and agencies seeking redress in relation to environmental reviews covered by an *approved* certification shall deal with the recipient and not HUD," implicitly suggesting that until that time HUD is to receive and address inquiries and complaints. *See Brandon v. Pierce,* 725 F.2d 555, 560 (10th Cir.1984) (stating that Secretary's acceptance of the certification satisfies HUD's NEPA responsibilities); *National Center for Preservation Law v. Landrieu,* 496 F.Supp. 716, 731 (D.S.C. 1980) (§ 5304(h) "requires an applicant to accompany a request for release of funds with a certification ... that the applicant has fully carried out its responsibilities under the NEPA.... The Secretary's approval of such certification is deemed by the statute to have satisfied his responsibilities under NEPA."), *aff'd,* 635 F.2d 324 (4th Cir.1980).

Accordingly, for the reasons discussed above, HUD's motion is denied.

## C. Municipal Defendants' Motion

The municipal defendants have moved to dismiss plaintiffs' fifth claim pursuant to Fed.R.Civ.P. 12(b)(1) on the ground that the court lacks subject matter jurisdiction because the claim is not yet ripe. The municipal defendants maintain that there has not been a "final" agency action as required by § 10 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 704 (1982), in order to make the claim justiciable.

■ Although the City has completed its draft and final environmental impact statements, it has not yet submitted to HUD its Record of Decision, Notice of Intent, and

Request for Release of Funds.[12] Only on completion of these steps, contend the defendants, can HUD release funds to the grant applicant, thereby making the agency action final. Plaintiffs answer that for HUD's action to be "final," there need only be final action on the substantive provision complained of, in this case, the environment review. I conclude, having evaluated "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration," *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967), that the plaintiffs' fifth claim is ripe. However, further action on this claim is stayed pending completion of the application process.

In *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967), the Court elaborated on the rationale for and the purposes to be served by the ripeness doctrine.

[I]t is fair to say that its basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*Abbott* has been construed to require an evaluation both of the nature of the agency action and the effect on the plaintiffs of withholding review of their claims.

Ultimately, what we must determine under this test is whether the agency action is sufficiently final or definitive so that we would have no interest in postponing review until the issues are more concrete. If the court's interest tends toward postponement, we must then weigh this consideration against the immediate impact of the actions on the challengers, and whether that impact is so harmful that present consideration is warranted.

---

12. The City has represented that it hopes the process, including the release of funds, will be complete by early next year.

*Midwestern Gas Transmission Co. v. FERC,* 589 F.2d 603, 618 (D.C.Cir.1978) (footnote omitted). *See also Continental Air Lines v. CAB,* 522 F.2d 107, 125 (D.C. Cir.1974) (en banc) (for agency action to be reviewable, "the interests of the court and agency in postponing review until the question arises in some more concrete and final form [must] be outweighed by the interest of those who seek relief from the challenged action's 'immediate and practical impact' upon them") (footnote omitted).

The municipal defendants contend that the issues presented by plaintiffs' fifth claim will be more concrete after HUD acts on the City's request for release of funds. In support of their argument, they rely on environmental cases in which challenges to substance of the EISs were rejected until "final agency action has been taken." *Sierra Club v. U.S. Army Corps of Engineers,* 481 F.Supp. 397, 399 (S.D.N.Y.1979). In *Sierra Club,* the plaintiffs challenged the Army Corps' determination that its EIS, which was required as part of an application for landfill permits, did not need to be supplemented. The court granted the defendants' motion to dismiss, finding that there had not been a final agency action because the Army Corps had not decided whether to grant the permits. Absent completion of the administrative decision making—"until final orders on the proposed action have been issued"—the case was held nonjusticiable. *Id. See also Association of Community Org. for Reform Now (ACORN) v. Southeastern Pa. Transp. Auth.,* 462 F.Supp. 879, 884 (E.D. Pa.1978) (granting motion to dismiss action challenging proposed fare increase and its effect on air quality because the Secretary had not yet reviewed or approved the application for a fare increase), *aff'd without opinion,* 605 F.2d 1194 (3rd Cir.1979); *NRDC v. Andrus,* 448 F.Supp. 802, 806 (D.D.C.1978) (rejecting challenges to adequacy of EIS because only issue before

the court was defendants' notice of a proposed deviation from court's final judgment, but also stating that review of the EIS should wait until "the statements are completed and final" and until "final agency action").[13]

There is certainly merit to the municipal defendants' argument that HUD's action in this case is not final, and therefore reviewable, until all steps in the application process outlined in 24 C.F.R. Part 58 (1988) have been completed. However, although that may be the point at which HUD views its action as final, "the label an agency attaches to its action is not determinative." *Continental Air Lines v. CAB,* 522 F.2d 107, 124 (D.C.Cir.1974) (en banc). Moreover, the line of cases dismissing similar claims for lack of ripeness—because the federal agency involved had not yet acted on an application—does not end the inquiry as to the finality of HUD's action in this case. As plaintiffs emphasize, the finality requirement is interpreted in a "flexible," "pragmatic" fashion. *Abbott Laboratories,* 387 U.S. at 149–50, 87 S.Ct. at 1515–16. *See also National Wildlife Federation v. Goldschmidt,* 677 F.2d 259, 263 (2d Cir.1982) (finality requirement is to be interpreted pragmatically "with an eye toward protecting agencies from the disruption of piecemeal appeals and toward insuring that judicial review involves concrete disputes over meaningful interests, rather than abstract disputes over hypothetical governmental actions").

In this case, all stages of the environmental review process are complete and HUD has preliminarily approved the City's UDAG application. As the court stated in *Kleppe v. Sierra Club,* 427 U.S. 390, 406 n. 15, 96 S.Ct. 2718, 2728 n. 15, 49 L.Ed.2d 576 (1976), in the context of a challenge by environmental organizations to the Department of the Interior and other federal agencies' failure to prepare a comprehen-

**13.** *Wicker Park Historic District Preservation Fund v. Pierce,* 565 F.Supp. 1066 (N.D.Ill.1982), another case upon which defendants rely, does not provide guidance in the case at hand. The court's statement that it had previously "dismissed the case with leave to reinstate because

HUD had not yet completed its review process nor had it made a final determination regarding federal funding of the project," *id.* at 1071, is simply included in the description of the case history, without detail or analysis, that would reveal the extent of its applicability to this case.

sive EIS before allowing further development of coal reserves in the Northern Great Plains region,

> the time at which a court enters the process is when the report or recommendation on the proposal is made, and someone protests either the absence or adequacy of the final impact statement. This is the point at which an agency's action has reached sufficient maturity to assure that judicial intervention will not hazard unnecessary disruption.

Relying on this language, the court in *Committee Against Railroad Relocation v. Adams*, 471 F.Supp. 142 (E.D.Ark.1979), rejected a challenge to a *draft* environment impact statement for a railroad demonstration project. The court, although stating that there is no basis for judicial review until a project is approved by the appropriate federal agency, emphasized that the EIS was only a draft: "Plaintiff cannot establish that a specific injury will result to the organization or to its members from defendants' actions with respect to the project until the *final* EIS draft is complete, approved and filed with EPA." *Id.* at 145. *Cf.* 40 C.F.R. § 1500.3 (1987) (stating in regulations designed to implement the procedural provisions of NEPA that the Council on Environmental Quality intends "that judicial review of agency compliance with these regulations not occur before an agency has filed the final environmental impact statement...."). In this case, not only has the FEIS long since been complete, HUD has, with full knowledge of the FEIS and the EPA's assessment of it, preliminarily approved a $10.73 million grant.

Defendants, as a way of arguing both that the preliminary approval is not sufficiently concrete to be "final" and that deferral will not impose a significant hardship on the plaintiffs, contend that the remaining application process provides an opportunity for plaintiffs' challenge to be raised and considered by HUD. Interested parties may object to the RROF within 15 days of its submission to HUD on the grounds specified in 24 C.F.R. § 58.75 (1988), which permits challenges primarily to the recipient's procedural rather than substantive omissions or shortcomings. Subsection (h)

provides that a federal agency may object to recipient's RROF by submitting "a written finding that the project is unsatisfactory from the standpoint of environmental quality."

Thus, the EPA could, in the remaining stages, object to the Project, as it did in its letter of October 23, 1986, because of its failure to satisfy the Clean Air Act, and HUD could, upon considering the objection, refuse the RROF. Although this scenario may raise doubt about the ultimate success of the Project's UDAG application, defendants do not successfully argue that the plaintiffs' allegation of hardship, namely that HUD will disburse the Project funds and construction soon begin, is "wanting," *State Farm Mutual Automotive Ins. v. Dole*, 802 F.2d 474, 480 (D.C.Cir.1986) ("a party's allegation of hardship will be found wanting if there are too many 'ifs' in the asserted causal chain linking the agency's action to the alleged hardship"), *cert. denied*, —— U.S. ——, 107 S.Ct. 1616, 94 L.Ed.2d 800 (1987). After all, HUD's preliminary approval of a $10.73 million grant came after the EPA apprised it of the Project's environmental shortcomings. Moreover, even the defendants do not argue that the objections in § 58.75 encompass a challenge by the *plaintiffs* to the Project; at best, plaintiffs are left relying on a federal agency to act. Finally, the City's representations that it plans to submit the ROD in the immediate future indicates that there is little possibility that the City will abandon or significantly alter the Project proposal, thus lending further support to the conclusion that this claim is ripe. *See Environmental Defense Fund v. Johnson*, 476 F.Supp. 126, 130 (S.D.N.Y. 1979) (holding environmental challenge to water project was not ripe because a further report on the project, as well as a recommendation as to whether it should proceed, was expected, thus creating a possibility the project would be "abandoned or significantly altered"), *aff'd*, 629 F.2d 239 (2d Cir.1980).

In sum, because the EIS is final and the grant has been preliminarily approved, the issue presented in plaintiffs' fifth claim is

ripe for judicial decision and the municipal defendants' motion is denied.[14]

█ Although the defendants' motion to dismiss is denied, further action on the fifth claim is stayed until HUD acts on the RROF. *Cf. C–Cure Chemical Co. v. Secure Adhesives Corp.*, 571 F.Supp. 808, 823–24 (W.D.N.Y.1983) (retaining jurisdiction but staying action pending resolution by administrative agency under doctrine of primary jurisdiction). It cannot be said, given the nearly two years that have passed since the time of the approval, that staying the claim until HUD acts on the RROF, which the City anticipates this winter, will cause the plaintiffs undue harm. The relief they seek—to adjudge that the City did not act in accordance with its delegated duty of ensuring that federal funds do not support a project that fails to conform with a SIP and to enjoin the City from accepting the funds until the Clean Air Act and New York SIP requirements are satisfied—can be provided at a later date, if appropriate, and before the Project progresses further.

HUD's motion to dismiss the fourth claim and the municipal defendants' motion to dismiss the fifth claim are denied; further action on the fifth claim is stayed pending a decision by HUD on the RROF for the Project.

It is so ordered.

---

**14.** In the recent decision in *South Portland Avenue Block Association v. Pierce,* No. 87–4210 (E.D.N.Y. September 23, 1988), the court denied the municipal defendants' motion to dismiss a similar claim. The court held that the issue was ripe because the environmental impact statements were not subject to change nor had the defendants suggested that the Project would be altered or abandoned. The reasoning of that case is persuasive; however, to the extent the court concluded that the environmental impact statements were final because HUD had delegated the environmental review process to the City, the decision provides limited support for the holding in the case at hand.